J-S01025-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH SENTORE COLEMAN, JR. | : | |
| | : | |
| Appellant | : | No. 710 MDA 2020 |

Appeal from the Judgment of Sentence Entered February 13, 2020
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0000352-2019

BEFORE: LAZARUS, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.:         **FILED APRIL 23, 2021**

     Joseph Sentore Coleman, Jr. (Appellant) appeals from the judgment of sentence imposed February 13, 2020, in the Lycoming County Court of Common Pleas. Appellant was sentenced to an aggregate term of life imprisonment, following his jury convictions of first-degree murder, robbery,[1] and related offenses, for the August 2016 shooting death of Christopher Wilkins. On appeal, Appellant challenges both the sufficiency and weight of the evidence supporting his convictions, the admission of inflammatory photos of the deceased, the court's refusal to provide a missing witness instruction, and the court's refusal to permit the testimony of a defense witness that another person admitted to committing the crime. We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 3701(a)(1)(iii).

The testimony presented during Appellant's jury trial is summarized by the trial court as follows:

On August 30, 2016, Appellant approached Jamal Brown regarding a drug debt Brown owed him. Appellant told Brown that he wanted to commit a robbery at 505 Park Avenue because a guy from Philadelphia sold drugs out of that residence. Appellant told Brown that he would consider the debt paid if Brown helped him. He asked Brown to describe the layout of 505 Park Avenue, which Brown did, and then Appellant left.

* * *

Appellant returned and said, "It's a go." Brown got into the vehicle with Appellant[ and Appellant's girlfriend, Ariel Harlan, who was driving. Harlan] drove them to a house near Washington Boulevard. Harlan went inside the house and came back to the vehicle with a bag. Then they drove to Timberland Apartments, picked up James Calvin Rooks, and drove back to the area of 505 Park Avenue.

Appellant pulled a small revolver out of a bag and gave it to Rooks and he gave Rooks something to put over his face. Appellant pulled out a bigger revolver for himself. Brown saw Appellant and Rooks go inside 505 Park Avenue. About an hour later, Brown saw Appellant at the Shamrock bar in different, lighter-colored clothing.

[ ] Harlan testified that Appellant, Brown and Rooks were in her vehicle, a black Dodge Dart, on August 30, 2016. She parked the vehicle on Cherry Street. Brown got out of the vehicle and went around the corner toward 505 Park Avenue. Brown returned a few minutes later. Appellant and Rooks got out of the vehicle and had a "pow wow" meeting with Brown on the sidewalk. Brown walked away. Appellant and Rooks walked toward 505 Park Avenue. A few minutes later, Harlan heard a gunshot and then saw Appellant and Rooks turning the corner coming back to her vehicle. She saw Appellant "shove a cloth thing and a gun in his waistband." They jumped in the vehicle and Appellant screamed for her to drive. Appellant threw the cloth out of the car on the way to Turkey Hill. It was a mask.

Tyrone "Tyke" Small testified that he was sitting in the living area in 505 Park Avenue. Two "dudes" ran in and said, "This is a robbery." One of them slapped him on the back of his shoulder with a gun and he fell to the floor. They [let] him up and walked him over to the Victim's bedroom. They opened the bedroom door and made him get down on the ground. The person with the gun pointed it at the Victim and asked him where the "stuff" was. The Victim said he did not know. The person asked again and the Victim said he did not know what the person was talking about and then one of them shot the Victim. Both people were wearing masks, but Small could see their skin and knew they were Black. The Victim fell to the floor and one of the people, the smaller one,[5] went through the Victim's pockets.

_____

[5] Appellant is smaller than Rooks.

_____

[ ] Rooks testified that Appellant came to his residence [and] said he needed him for something, but he did not tell him what. Appellant had a weapon on his waist and said, "Ain't going to be no problem." Rooks did not want anything to happen to his kids or his kids' mom so he got in the vehicle. Harlan was driving. They drove up to a person, Appellant spoke to him, and then the person got in the vehicle. Appellant tried to give Rooks a weapon but he did not want it.

Appellant and Rooks went to the back of the house at 505 Park Avenue. Appellant gave Rooks a pant leg or something to put over his face. Appellant was wearing a ski mask and grey hat. They went inside the residence. Appellant told the Victim to "give it up." The Victim said he didn't have anything. There was another individual in there who Appellant hit with his gun and he was down on the floor. Appellant pointed his gun at the Victim. The Victim was holding Appellant's arm a little bit. Appellant pointed the gun at the Victim and shot the gun at him.

Trial Ct. Op., 9/2/20, at 1, 6-8 (citations to trial transcript omitted).

During the investigation at the scene of the shooting, police recovered a gray baseball cap and "black scarf or sleeve." Trial Ct. Op. at 8. Subsequent testing revealed "DNA mixtures of at least 3 people" on the black sleeve and

baseball cap. *Id.* at 9. However, "Appellant's DNA was the major component of . . . DNA samples" taken from those two items. *Id.* at 9-10.

During the course of investigating an unrelated double homicide,[2] Williamsport Police gathered evidence implicating Appellant in the Park Avenue robbery and shooting. He was arrested in February of 2019.[3] A criminal information was filed on April 1, 2019, charging him with criminal homicide, robbery (three counts), criminal conspiracy to commit robbery, possessing an instrument of crime, and burglary.[4]

The case proceeded to a jury trial commencing on February 10, 2020. On February 13th, the jury returned a verdict of guilty on all charges,

_____

[2] On February 19, 2019, Appellant was convicted of two counts of second-degree murder and related offenses for an unrelated gunpoint robbery that occurred on October 31, 2016. His direct appeal from that conviction is pending before this Court. *See Commonwealth v. Coleman*, 672 MDA 2020.

[3] Rooks was also arrested and charged with criminal homicide and related offenses. On July 30, 2020, he entered a guilty plea to one count of conspiracy to commit robbery and was sentenced to a term of nine months' to four years' imprisonment. *See Commonwealth v. Rooks*, CP-41-CR-0000353-2019.

[4] 18 Pa.C.S. §§ 2201(a), 3701(a)(1)(i)-(iii), 903(a)(1), 907(b), 3502(a)(1).

Appellant was also charged with conspiracy to commit homicide, persons not to possess firearms and firearms not to be carried without a license. *See* 18 Pa.C.S. §§ 6105(c)(2), 6106. The trial court granted Appellant's pretrial motion to sever the firearms offenses, and the Commonwealth subsequently *nolle prossed* those charges after the jury's verdict. *See* Order, 10/22/19, at 1; Order, 4/15/20. The Commonwealth also withdrew the second count of conspiracy. *See* Order, 2/13/20.

specifically finding Appellant guilty of both first- and second-degree murder. The trial court immediately proceeded to sentencing, whereupon it imposed the mandatory sentence of life imprisonment without parole.[5]

Appellant filed a timely post-sentence motion challenging the weight of the evidence supporting his convictions, and asserting the trial court improperly charged the jury. **See** Appellant's Post Sentence Motion, 2/24/20, at 3-5. On May 6, 2020, the trial court entered an order and opinion denying Appellant relief. This timely appeal follows.[6]

Appellant raises the five issues for our review:

I.     Whether the verdicts of guilty were based on insufficient evidence[?]

II.    Whether the verdicts of guilt were against the weight of the evidence[?]

III.   Did the trial court abuse its discretion by permitting the jury to have inflammatory and overly prejudicial photos in its possession during deliberations?

IV.    Did the trial court err in failing to charge the jury with a failure to call potential witness instruction even though the Commonwealth failed to call three of the eyewitnesses who were at the scene of the crimes?

_____

[5] The court imposed concurrent sentences on the remaining offenses, but directed that the life sentence run consecutively to any other sentences Appellant was then serving. **See** Order, 2/13/20, at 1- 5 (unpaginated). As noted supra, Appellant was convicted of two counts of second-degree murder a year earlier. **See Commonwealth v. Coleman**, 672 MDA 2020.

[6] Appellant complied with the trial court's directive to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On September 2, 2020, the trial court filed a comprehensive, 28-page opinion.

V. Did the trial court err by precluding the exculpatory testimony of Leon Hall who would have testified that one of the eyewitnesses who testified against [Appellant] admitted to committing the crimes[?]

Appellant's Brief at 7.

Preliminarily, we set forth the relevant law and standards of review concerning the claims raised by Appellant on appeal. Challenges to the sufficiency and weight of the evidence supporting a conviction are discrete inquiries:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. . . . When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

A motion for new trial[,] on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. . . .

*Commonwealth v. Widmer*, 744 A.2d 745, 751–52 (Pa. 2000) (citations omitted). Thus, when considering a weight claim,

an appellate court must review the trial court's exercise of discretion. . . . We do not contemplate the underlying question of whether the verdict actually was against the weight of the evidence. Rather, we evaluate the trial court's decision of that issue, and we do so under an abuse of discretion standard.

*Commonwealth v. Clemons*, 200 A.3d 441, 463–64 (Pa. 2019) (citation omitted), *cert. denied*, 140 S. Ct. 176 (2019). "In order for a defendant to

prevail on a challenge to the weight of the evidence, 'the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" ***Commonwealth v. Talbert***, 129 A.3d 536, 546 (Pa. Super. 2015).

Questions concerning the admissibility of evidence are within the discretion of the trial court, and "only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." ***Commonwealth v. Sanchez***, 36 A.3d 24, 48 (Pa. 2011) (citations omitted). Photographic evidence may be deemed inflammatory and inadmissible following a two-step analysis:

> "First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury." The availability of alternate testimonial evidence does not preclude the admission of allegedly inflammatory evidence.

***Id.*** at 49 (citations omitted). Further, the trial court has the discretion to determine what evidence or exhibits the jury may view during deliberations. ***See*** Pa.R.Crim.P. 646(A) ("Upon retiring, the jury may take with it such exhibits as the trial judge deems proper[.]"); ***Commonwealth v. Haney***, 131 A.3d 24, 38-39 (Pa. 2015).

A trial court's refusal to give a requested jury instruction does not constitute reversible error unless the defendant was prejudiced by the court's refusal. ***Commonwealth v. Miller***, 172 A.3d 632, 645 (Pa. Super. 2017).

> "When evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper." A trial

court has "broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." "Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error."

*Id.* (citations omitted).

Hearsay statements, though generally precluded, may be admissible if a defendant establishes, *inter alia*, "the declarant is unavailable as a witness" and the statement is against the declarant's interest. Pa.R.E. 804(b)(3). The Rule defines a statement against interest as one that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(b)(3)(A)-(B). As with any evidentiary claim, the determination of whether a statement meets the exception to the hearsay requirement lies within the discretion of the trial court. *Commonwealth v. Benson*, 10 A.3d 1268, 1274-74 (Pa. Super. 2010).

Appellant first argues the evidence was insufficient to support his convictions. He contends the Commonwealth's only eyewitness who identified Appellant as the shooter — Rooks — was not credible because he was also charged with the crime. Appellant's Brief at 14. Appellant also maintains Rooks' testimony was contrary to the physical evidence, *i.e.*, where Rooks claimed he wore the sleeve over his head, his DNA was not found on the item. *See id.* at 14-15, 18. Further, Appellant asserts Small, the only eyewitness

to the shooting who was not charged, testified that he heard Rooks' voice in prison sometime after the incident and "did not recognize it as one of the shooters who forced him to the ground." *Id.* at 15-16. Appellant also emphasizes that another witness who was in the house at the time of the shooting, Lewis Martin, testified that neither of the culprits was Appellant, whom he had known for more than 12 years and would have recognized. *See id.* at 16. Martin also stated that neither of the robbers had dreadlocks, yet Rooks testified he had dreadlocks at the time of the shooting. *See id.* at 19. Lastly, Appellant points to the testimony that he was wearing a baseball hat that time of the shooting, but the hat recovered from the crime scene had no blood on it. *Id.* at 20.

Appellant relies on these same arguments in his second issue, asserting the verdicts were against the weight of the evidence.[7] *See* Appellant's Brief at 21. He further contends the benefit Rooks received from the prosecution for his testimony, "in addition to his uncorroborated testimony regarding his dreadlocks as well as the lack of DNA on a mask that he is alleged to have worn, makes [Rooks'] testimony unreliable and not credible." *Id.* Appellant also emphasizes the Commonwealth did not call Lewis Martin as a witness, when Martin told police on the day of the shooting that Appellant was not

_____

[7] We note Appellant properly preserved his weight of the evidence claim by raising it in a timely post-sentence motion. *See* Pa.R.Crim.P. 607(A)(3); Appellant's Post Sentence Motion, 2/24/20, at 3-5.

- 9 -

involved. *See id.* at 22. Thus, Appellant maintains the jury's verdict was speculative and against the weight of the evidence. *Id.* at 23.

In his third issue, Appellant contends the trial court abused its discretion when it "permitted the jury to view inflammatory photographs even though [Appellant] was not disputing that the decedent was shot to death." Appellant's Brief at 23. He insists that photographs were not relevant, and the court failed to explain "how the photos were not inflammatory and prejudicial to the jury[.]" *Id.* at 26. Appellant also claims "the photos should not have been illuminated in the dark to further emphasize . . . their shocking nature to the jury." *Id.*

Next, Appellant insists the trial court erred when if failed to instruct the jury to draw an unfavorable inference from the fact that the Commonwealth failed to call two witnesses — Jeffrey Green and Jerry Green. *See* Appellant's Brief at 26, 29; *see also* Pa. SSJI (Crim), § 3.21A (Failure to Call Potential Witness). He maintains the witnesses were "material," he was not able to locate them, but the Commonwealth was "aware as to [their] location." *Id.* at 29.

Lastly, Appellant argues the trial court abused its discretion when it excluded, as hearsay, testimony that another person admitted to shooting the victim. Appellant's Brief at 30. He claims Leon Hall would have testified that "shortly after the shooting" he spoke to Jamal Brown, and that Brown admitted he was the shooter. *Id.* Appellant contends Hall's proposed testimony was

relevant, and admissible as a statement against interest pursuant to Pa.R.E. 804(b)(3).

Upon our review of the record, the parties' briefs, and the relevant statutory and case law, we conclude the trial court's September 2, 2020, opinion thoroughly addresses and properly disposes of Appellant's claims on appeal. Accordingly, we rest on its well-reasoned bases. *See* Trial Ct. Op. at 3-10 (evidence was sufficient to prove beyond a reasonable doubt that Appellant "while wearing a mask and armed with a firearm" entered the residence intending to rob the victim, and during the course of the robbery, fatally shot the victim in the head); 10-19 (the verdict "was not so contrary to the evidence as to shock one's sense of justice[;]" the testimony did not establish there would have been blood on the hat had Appellant worn it during the shooting; Martin admitted under cross-examination "he could not see either of [the robbers'] faces" because one was wearing a ski mask and the other had his face partially covered; Rooks testified he had no agreement with the Commonwealth in exchange for his testimony; Small testified that when he heard Rooks' voice in prison he did not connect it to the shooting because he "wasn't thinking about it"); 19-22 (photographs of the victim's body were not inflammatory or unduly prejudicial, but instead relevant to show "stippling," in order to estimate firing distance);[8] 22-25 (Appellant not entitled

_____

[8] We note Appellant's argument in his brief differs from that in his Rule 1925(b) concise statement, where he challenged only the trial court's decision

to failure to call witness instruction because the witnesses were equally available to both parties, and proposed testimony would have been irrelevant or cumulative); 25-28 (Hall's proposed testimony — that Brown admitted he was the shooter — was hearsay and did not meet the exception as a statement against interest because Brown was not unavailable to testify, his purported admission was "very vague," and it was not made under circumstances indicating its trustworthiness).

Judgment of sentence affirmed. We direct that a copy of the trial court's September 2, 2020, opinion be filed along with this memorandum and attached to any future filings in this case.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/23/2021

_____

to allow the jury to have the photographs in its possession during deliberations. **See** Appellant's Concise Statement of Matters Complained of on Appeal Pursuant to Rule 1925(B) Order, 6/12/20. For that reason, we could consider this claim waived. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Received 12/14/2020 1:32:20 PM Superior Court Middle District

RECEIVED

Filed 12/14/2020 1:32:00 PM Superior Court Middle District
710 MDA 2020

SEP 03 2020

DISTRICT ATTORNEY

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH** | : | **No. CP-41-CR-0000352-2019** |
| | : | |
| **vs.** | : | **CRIMINAL DIVISION** |
| | : | |
| | : | |
| **JOSEPH SENTORE COLEMAN, JR.,** | : | |
| **Appellant** | : | **1925(a) Opinion** |

## <u>OPINION IN SUPPORT OF ORDER IN COMPLIANCE WITH RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE</u>

This Opinion is written in support of the trial court's judgment of sentence entered on February 13, 2020, which became final on May 6, 2020 when the trial court issued its opinion and order denying Appellant's post sentence motion.

This case arose out of a shooting that occurred at 505 Park Avenue in Williamsport, Pennsylvania.

On August 30, 2016, Appellant approached Jamal Brown regarding a drug debt Brown owed him. Appellant told Brown that he wanted to commit a robbery at 505 Park Avenue because a guy from Philadelphia sold drugs out of that residence. Appellant told Brown that he would consider the debt paid if Brown helped him. He asked Brown to describe the layout of 505 Park Avenue, which Brown did, and then Appellant left.

Appellant returned later and said, "it's a go." Brown got into a vehicle with Appellant and his then-girlfriend, Ariel Harlan, who was driving. They drove to a residence and picked up James "Calvin" Rooks. Then they drove back to the area of 505 Park Avenue.

1

Harlan parked the vehicle on Cherry Street.

Appellant pulled a small revolver out of a bag and gave it, as well as a mask made out of a dark-colored sleeve or pant leg, to Rooks. Appellant pulled out a bigger, black revolver and a ski mask for himself.

Brown got out of the vehicle and walked toward 505 Park Avenue to make sure that the door was unlocked. He returned to the vehicle, met with Appellant and Rooks, told them that the door was unlocked, and then walked away.

Appellant and Rooks entered 505 Park Avenue. Tyrone Small was in the living area just inside the door. Appellant hit Small on the back of his right shoulder with a gun, knocking him down. He got him up, opened the door to the adjoining bedroom of Christopher Wilkins[1] (hereinafter "Victim"), and put Small on the ground inside the bedroom. Appellant pointed his firearm at the Victim and asked him where the "stuff" was. When the Victim said he didn't know or he didn't have anything, Appellant shot him. One of them rifled through the Victim's pockets and then they ran out of the door. As they ran out of the residence, they dropped the sleeve mask and a baseball hat on the porch. They ran back to the vehicle, and Appellant yelled for Harlan to drive away.

The Commonwealth charged Appellant with criminal homicide, conspiracy to commit criminal homicide, three counts of robbery, conspiracy to commit robbery, burglary, possession of instruments of crime (weapon), person not to possess firearm, and firearm not to be carried without a license. The trial court severed the two firearms charges for trial

---

[1] Due to an inadvertent dictation error, Victim's name is incorrectly stated as Christopher Williams in the opinion and order denying Appellant's post sentence motion.

2

purposes.[2]

A jury trial was held February 10-13, 2020 on all of the charges except the severed firearms charges. At trial, the Commonwealth withdrew the charge of conspiracy to commit criminal homicide. On February 13, 2020, the jury found Appellant guilty of first-degree murder, second-degree murder, burglary, possessing instruments of crime, and three counts of robbery. The trial court sentenced Appellant to life in prison without the possibility of parole for first-degree murder to be served consecutive to any and all sentences that Appellant was serving.[3]

On February 24, 2020, Appellant filed a post sentence motion in which he asserted that the verdict was against the weight of the evidence and that the jury was improperly charged that it could find Appellant guilty of first, second and third degree murder. In an opinion and order entered on May 6, 2020, the trial court denied Appellant's post sentence motion.

Appellant filed a timely notice of appeal. Appellant filed a concise statement of matters complained of on appeal in which he raised five issues.

Appellant first asserts that the verdicts of guilt were based on insufficient evidence. Although the jury convicted Appellant of numerous offenses, Appellant has not specified either the offense or the element or elements upon which the evidence was insufficient. Therefore, Appellant has waived this issue. *Commonwealth v. Carr*, 227 A.3d 11, 18 (Pa. Super. 2020)(If an appellant wants to preserve a claim that the evidence was

---

[2] Ultimately, the Commonwealth nolle prossed the severed firearms charges.
[3] The court imposed concurrent sentences for the remaining charges, except for one count of robbery that merged with second-degree murder.

3

insufficient, then the Rule 1925(b) statement needs to specify the element or elements upon which the evidence was insufficient); *Commonwealth v. Ellison*, 213 A.3d 312, 320-321 (Pa. Super. 2019)(In order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's [Pa.R.A.P.] 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient, particularly where the appellant is convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt); *Commonwealth v. Hoffman*, 198 A.3d 1112, 1125 (Pa. Super. 2018)(same); *Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015)(Where a 1925(b) statement does not specify the allegedly unproven elements, the sufficiency claim is waived on appeal).

Even if Appellant has not waived this issue, Appellant's claim lacks merit. Based on Appellant's post sentence motion regarding the weight of the evidence, the trial court believes Appellant is asserting that the evidence was insufficient to establish that Appellant committed the crimes or that he committed an intentional killing.

When reviewing a sufficiency claim, the court considers whether the evidence introduced at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish the elements of the offense beyond a reasonable doubt. *Commonwealth v. Smith*, 2020 WL 4146845, *3 (Pa., July 21, 2020); *Commonwealth v. Sanchez*, 36 A.3d 24, 37 (Pa. 2011). "Furthermore, the Commonwealth may sustain its burden by wholly circumstantial evidence and the jury is free to believe all, part, or none of the evidence." *Commonwealth v. Thomas*, 215 A.3d 36, 40 (Pa. 2019).

4

"A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa. C.S. §2502(a). "To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the Appellant perpetrated the killing, and the Appellant acted with malice and a specific intent to kill." *Commonwealth v. Mattison*, 623 Pa. 174, 82 A.3d 386, 392 (2013). Both the specific intent to kill and malice may be inferred from the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Hicks*, 638 Pa. 444, 156 A.3d 1114, 1124 (2017).

The forensic pathologist, Dr. Barbara Bollinger, testified that the Victim had a gunshot wound to the left ear and that the projectile went into his skull. The projectile fractured his skull and created hemorrhages within his brain and the uppermost portion of his spinal cord. The gunshot would have killed the Victim within seconds. Dr. Bollinger also testified that there was stippling around the gunshot entrance wound.[4] Stippling represents an intermediate range of fire from about 12 inches to 3 feet. Trial Transcript, Feb. 12, 2020, at 16-20.

Jamal Brown testified that Appellant gave him $1000 of crack cocaine. Brown was supposed to sell the cocaine and give Appellant $700. However, he only gave Appellant $400; he was short by $300. Appellant asked Brown about the money. Brown asked for more time. Appellant asked Brown if he would like to clear the debt by explaining what goes on at 505 Park Avenue. Brown said he would like to do that. Trial Transcript, Feb. 11, 2020, at 20-21.

Appellant then told Brown that he wanted to rob 505 Park Avenue because

---

[4]Stippling is abrasions or cuts of the skin that occur from unburned powder and other debris that may be present in the barrel of a gun when it is discharged. Trial Transcript, Feb. 12, 2020, at 18.

5

"guys from Philadelphia were selling drugs out of that house." Appellant asked Brown about the layout of the house and if it was easy to get in. Brown told Appellant that there was no lock on the door and the guys did not have any weapons or anything. Appellant left but said he would be back. Trial Transcript, Feb. 11, 2020, at 21.

Appellant returned and said, "It's a go." Brown got into the vehicle with Appellant. Appellant's girlfriend, Ariel Harlan, drove them to a house near Washington Boulevard. Harlan went inside the house and came back to the vehicle with a bag. Then they drove to Timberland Apartments, picked up James Calvin Rooks, and drove back to the area of 505 Park Avenue. Trial Transcript, Feb. 11, 2020, at 22-23.

Appellant pulled a small revolver out of a bag and gave it to Rooks and he gave Rooks something to put over his face. Appellant pulled out a bigger revolver for himself. Brown saw Appellant and Rooks go inside 505 Park Avenue. About an hour later, Brown saw Appellant at the Shamrock bar in different, lighter-colored clothing. Trial Transcript, Feb. 11, 2020, at 23-24, 26-28.

Ariel Harlan testified that Appellant, Brown and Rooks were in her vehicle, a black Dodge Dart, on August 30, 2016. She parked the vehicle on Cherry Street. Brown got out of the vehicle and went around the corner toward 505 Park Avenue. Brown returned a few minutes later. Appellant and Rooks got out the vehicle and had a "pow wow" meeting with Brown on the sidewalk. Brown walked away. Appellant and Rooks walked toward 505 Park Avenue. A few minutes later, Harlan heard a gunshot and then saw Appellant and Rooks turning the corner coming back to her vehicle. She saw Appellant "shove a cloth thing and a gun in his waistband." They jumped in the vehicle and Appellant screamed for her to

6

drive. Appellant threw the cloth out of the car on the way to Turkey Hill. It was a mask. Trial Transcript, Feb. 11, 2020, at 10-12.

Tyrone "Tyke" Small testified that he was sitting in the living area in 505 Park Avenue. Two "dudes" ran in and said, "This is a robbery." One of them slapped him on the back of his shoulder with a gun and he fell to the floor. They left him up and walked him over to the Victim's bedroom. They opened the bedroom door and made him get down on the ground. The person with the gun pointed it at the Victim and asked where the "stuff" was. The Victim said he did not know. The person asked again and the Victim said he did not know what the person was talking about and then one of them shot the Victim. Both people were wearing masks, but Small could see their skin and knew they were Black. The Victim fell to the floor and one of the people, the smaller one,[5] went through the Victim's pockets. Trial Transcript, Feb. 11, 2020, at 91-93, 101.

Calvin Rooks testified that Appellant came to his residence at Timberland Apartments. Appellant said he needed him for something, but he did not tell him what. Appellant had a weapon on his waist and said, "Ain't going to be no problem." Rooks did not want anything to happen to his kids or his kids' mom so he got in the vehicle. Harlan was driving. They drove up to a person, Appellant spoke to him, and then the person got in the vehicle. Appellant tried to give Rooks a weapon but he did not want it.

Appellant and Rooks went to the back of the house at 505 Park Avenue. Appellant gave Rooks a pant leg or something to put over his face. Appellant was wearing a ski mask and a gray hat. They went inside the residence. Appellant told the Victim to "give

---

[5] Appellant is smaller than Rooks.

7

it up." The Victim said he didn't have anything. There was another individual in there who Appellant hit with his gun and he was down on the floor. Appellant pointed his gun at the Victim. The Victim was holding Appellant's arm a little bit. Appellant pointed the gun at the Victim and shot the gun at him. Trial Transcript, Feb. 11, 2020, at 105-113, 124, 130.

Sergeant Brian McGee of the Williamsport Bureau of Police testified that the police were dispatched to 505 Park Avenue for a shooting. The police cleared the residence and proceeded to establish a perimeter with crime scene tape. Trial Transcript, Feb. 10, 2020, at 39-43.

Detective Trent Peacock testified that there was a gray ball cap and a black scarf or sleeve laying on the back porch. The items were photographed, and the police obtained a search warrant for the residence. Trial Transcript, Feb. 10, 2020 at 96-97.

Trooper William Jones was called to assist the Williamsport police with the crime scene. He photographed a black cloth and a gray hat on the back deck. Trial Transcript, Feb. 10, 2020 at 110-111.

Trooper Russell Ramin collected the black cloth and gray hat from the crime scene and released them to Officer Joseph Ananea of the Williamsport Police. Trial Transcript, Feb. 10, 2020 at 119.

Officer Ananea took custody of those items from Trooper Ramin and locked them in an evidence locker at the Williamsport police station.

Detective Trent Peacock sent the black cloth or sleeve and the gray baseball hat to the Pennsylvania State Police (PSP) Wyoming lab. Trial Transcript, Feb. 12, 2020, at 59-60.

8

Brunee Coolbaugh of the PSP Wyoming lab received a Bode DNA buccal swab of Appellant from Detective Peacock and sent it to the PSP DNA lab. Trial Transcript, Feb. 12, 2020 at 66-67.

Kelsey Gober of the PSP Wyoming lab received a black cut-off sleeve, a Brooklyn Dodgers baseball hat, a known DNA sample from the Victim, and a known DNA sample from Rooks. She took cuttings from the sleeve and hat and sent them to the DNA lab, along with the known DNA samples from the Victim and Rooks. Trial Transcript, Feb. 12, 2002 at 71-78, 84.

Regina Kozer, a forensic DNA analyst at the PSP DNA lab in Greensburg extracted DNA from the Appellant's known DNA sample and created a DNA profile. She provided the data from her analysis to a private lab for additional analysis. Trial Transcript, Feb. 12, 2020, at 29.

Britney Lenig, a forensic DNA scientist for the PSP received the known blood sample card from the Victim (K1), a cutting from a black sleeve (Q1), a cutting from a Brooklyn Dodgers ball cap (Q2), and the known sample from Rooks (K2). Q1 and Q2 contained DNA mixtures of at least 3 people. Ms. Lenig could not obtain an interpretable DNA profile from these questioned samples and therefore could not make a comparison to any known reference samples. Trial Transcript, Feb. 12, at 40-46. She also conducted Y chromosome testing. The interpretable part of Q1 matched the known reference sample of Appellant with a match statistic of approximately one in every 8696 individuals. Id. at 57.

Jennifer Bracamontes is a DNA analyst at Cybergenetics. She received the DNA data and profiles from the PSP lab. She determined that Appellant's DNA was the

9

major component of the DNA samples from Q1, the black sleeve, and Q2, the ball hat. Appellant's DNA on Q1 was 468 octillion times more probable than a coincidental match to an unrelated African American. 468 octillion is 468 followed by 29 zeroes. Appellant's DNA on Q2 was 4.3 septillion times more probable than a coincidental match to an unrelated African American. 4.3 septillion is 43 followed by 24 zeroes. Trial Transcript, Feb. 12, 2020, at 63, 83-86.

The evidence presented at trial established that Appellant unlawfully killed the Victim. Appellant, while wearing a mask and armed with a firearm, entered 505 Park Avenue with the intent to commit a robbery. He demanded items from the Victim. When the Victim said he did not know what Appellant was talking about or that he did not have anything, Appellant pointed his firearm at the Victim and shot the Victim in the head from a distance of 12 inches to 3 feet. The projectile went through the Victim's left earlobe and into his skull, causing hemorrhaging in his brain and spinal cord and killing him within seconds. Since the head is a vital part of the human body, the jury could infer that Appellant committed the killing with the specific intent to kill and with malice aforethought.

Appellant avers that the verdicts of guilty were against the weight of the evidence. The court addressed this issue in its opinion and order entered on May 6, 2020. For the benefit of the appellate courts and the parties, the court will reprint the relevant portion of the opinion with some minor additions and corrections.

[Appellant] in his [post sentence] motion asserts that only three witnesses testified that [Appellant] committed the crimes, that all three witnesses had criminal charges pending and were receiving a benefit for their testimony, that no forensic evidence implicated [Appellant's] accomplice, that there was no blood on the hat that [Appellant] wore, that there was no blood on the cutoff mask that was worn by the accomplice, that

10

the Commonwealth failed to submit "referenced samples to the lab" for analysis to determine the identity of other individuals, that an eyewitness to the shooting indicated that neither of the assailants wore dreadlocks or twisties in their hair, that the only physical evidence was [Appellant's] DNA on items recovered at the scene along with the DNA of at least three other individuals and that [Appellant's] accomplice testified that [Appellant] and the decedent were "tussling and the gun went off." (Post-Sentence Motion, Paragraphs 8 through 34). Further, during the argument in this matter, [Appellant's] counsel argued that "the main problem" was that the one "actual eyewitness", Lewis Martin[,] testified that [Appellant] was not one of the two individuals that he saw there. (Post-Sentence Motion Transcript, p. 4). [Appellant's] counsel further argued that the other eyewitness, "Tyke" (Tyrone Small) served time at the prerelease facility with accomplice "Rooks" but didn't recognize him from his voice. (Post-Sentence Motion Transcript, p. 4). [Appellant's] counsel further argued that accomplice Rooks testified that he was wearing a mask that covered his entire face yet the mask was tested and only [Appellant's] DNA was found on the mask. (Post-Sentence Motion Transcript, p. 5). [Appellant's] counsel argued as well that despite [Appellant] allegedly being in close proximity when the shot was fired, there was no blood splatter on his hat although "there was blood splatter all across the room." (Post-Sentence Motion Transcript, p. 5).

"The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015). A trial court may only grant a new trial on a weight claim "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013).

A trial court should not grant a new trial because of a mere conflict in the testimony. *Id.* "Rather, to grant a new trial, the trial court must determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts, is to deny justice." *Id.*, quoting *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000). As well, the court may not reweigh the evidence and substitute its judgment for the factfinder. *Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa. Super. 2003).

Finally, a verdict is contrary to the evidence such that it shocks one's sense of justice when "the figure of justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Commonwealth v. Cruz*, 919 A.2d 279, 282 (Pa. Super. 2007).

The verdict in this case was not so contrary to the evidence

11

as to shock one's sense of justice. Notwithstanding all the facts, certain facts were not so clearly of greater weight that to ignore them or to give them equal weight with all the facts, would be to deny justice. Obviously, during its deliberations, the jury had the opportunity to weigh the credibility of all of the witnesses and the evidence presented at trial and determined which evidence it found most compelling.

The court will first address those facts which [Appellant] alleges are so clearly of greater weight that to ignore them would be to deny justice. While certainly, [Appellant's] counsel has an obligation to zealously represent [Appellant], many of the alleged facts are embellished in favor of [Appellant].

The testimony did not establish that there was blood splattered all across the room where the decedent was shot. Janiece Green, a neighbor who contacted 911 and who found the decedent was asked whether there was a lot of blood in the room. She answered that there was a lot of blood around him. (February 10, 2020 Transcript, pp. 63-64). When asked whether there was blood everywhere in the room, she answered "no." (February 10, 2020 Transcript, p. 63). Detective Trent Peacock who responded to the scene testified that while the decedent was face down in a pool of his own blood, there was blood on the front of a washing machine and on a sock found on the washing machine. (February 10, 2020 Transcript, pp. 100-101). Trooper William Jones of the Pennsylvania State Police was called to the scene to help with the processing by taking photos. (February 10, 2020 Transcript, pp. 109-110). It was his responsibility to document the crime scene by taking photographs as well as a video. (February 10, 2020 Transcript, p. 121). He testified regarding a photograph that he took of the scene depicting the washer and "some blood marks on the washer." (February 10, 2020 Transcript, p. 113). He testified as well that there was "blood associated on" a "rag...on the face of the washer." (February 10, 2020 Transcript, p. 113). Detective Peacock also testified as to a photograph depicting the decedent laying on the ground and there being a bloody sock on the front of the washing machine and a blood smear on the front of the washing machine. (February 10, 2020 Transcript, pp. 100-101). In fact, and contrary to what is alleged by [Appellant], no witness testified that there was "blood splatter all across the room."

As for James Rooks, prior to entering the residence, [Appellant] gave him a "little mask thing" for his face. (February 11, 2020 Transcript, p. 110). He described it as "like something like a pant leg" that he "put...over [his] face or whatever." (February 11, 2020 Transcript, p. 110). [Appellant] had a ski mask with "two holes in it and the mouth." (February 11, 2020 Transcript, p. 111). After the shooting, he took the mask off of his face and threw it on the ground. (February 11, 2020 Transcript, p. 129). He took it off by pulling it over his head. (February 11, 2020 Transcript, pp. 129-130).

12

As for Lewis Martin, he testified that he was in the residence when the assailants entered. (February 12, 2020 Transcript, pp. 131-132). Both individuals were wearing masks and one had a hat on. (February 12, 2020 Transcript, p. 141). The one with a hat on had a mask that covered his entire face. (February 12, 2020 Transcript, p. 145). While he did testify that neither one had dreadlocks (February 12, 2020 Transcript, pp. 132, 134), he later admitted that he could not see their hair. (February 12, 2020 Transcript, p. 147). Further, while he testified that [Appellant] was not one of the two individuals (February 12, 2020 Transcript, p. 133), he later admitted that he could not see either of their faces. (February 12, 2020 Transcript, p. 147). He said the one individual had a full ski mask and the other individual had his face partially covered where all he could see was the "eyes up". (February 12, 2020 Transcript, p. 146).

As for [Appellant's] claim that all three of the Commonwealth witnesses who testified regarding what occurred that day, had criminal charges pending and "were receiving a benefit for their testimony", such is simply not true. Ariel Harlan testified that charges were pending and that she was hoping to get favorable treatment although she was not advised or offered any benefit whatsoever. (February 11, 2020 Transcript, p. 16). Jamal Brown testified that he was charged with first degree murder but didn't know if he would be given any benefit from his testimony. (February 11, 2020 Transcript, pp. 43-44). Finally, James Rooks testified that he had no agreement with the prosecutors in exchange for him testifying. (February 11 2020 Transcript, p. 126).

As for Mr. Rooks, he testified that upon entering the decedent's room, [Appellant] pointed a gun at [the decedent]. (February 11, 2020 Transcript, p. 113). He testified that [Appellant] shot "the other dude." (February 11, 2020 Transcript, p. 113). Immediately following the gunshot, [Appellant] "ran out of the room." (February 11, 2020 Transcript, p. 114). In explaining what happened after [Appellant] pointed the gun at the decedent, Rooks testified that "they started tussling and from there and he shot-shot the gun off." (February 11, 2020 Transcript, p. 113). In further explaining what he meant by "tussling", Rooks explained that [Appellant] was holding the decedent's arm and the decedent was holding Appellant "a little bit" while Appellant had the gun pointed at him. (February 11, 2020 Transcript, p. 124). The whole incident "happened fast." (February 11, 2020 Transcript, p. 124).

The facts argued by [Appellant] and as actually reflected in the testimony of the witnesses, are far from greater weight than all of the other facts as presented at trial.

Sergeant Brian McGee was on duty on August 30, 2016 working for the Williamsport Bureau of Police and responded to 505 Park Avenue for a reported shooting. (February 10, 2020 Transcript, pp. 39-40). He entered the residence and in a room to the right he found the decedent

13

laying face down on the ground with a pool of blood surrounding his head. (February 10, 2020 Transcript, pp. 41, 42).

Janiece Green was living across the street on August 30, 2016 at 504 Park Avenue. (February 10, 2020 Transcript, pp. 52-53). She was at her home when Savoy Jennings came knocking on her window, hysterical, saying "something happened to his friend Chris." (February 10, 2020 Transcript, p. 55). As she was leaving her house to go over to 505 Park Avenue, she saw a person turning the corner off of Park Avenue. (February 10, 2020 Transcript, p. 64).

She went to 505 Park Avenue and entered where she saw the victim in one room and her Uncle Jeff in another room. (February 10, 2020 Transcript, pp. 55, 56, 61). He was asleep. (February 10, 2020 Transcript, p. 61). She woke him and he began getting into his wheelchair. (February 10, 2020 Transcript, pp. 55, 56, 61). She immediately called 911. (February 10, 2020 Transcript, p. 56). Savoy Jennings was friends with the decedent and was living with him at 505 Park Avenue on August 30, 2016. (February 10, 2020 Transcript, p. 68). At the time, Janiece Green was his girlfriend. (February 10, 2020 Transcript, p. 69).

Earlier in the day, between approximately 9:00 a.m. and 12:00 noon, he was at the decedent's house sitting in his room with him and smoking. (February 10, 2020 Transcript, p. 69). He left briefly to go across the street to see Janiece but soon returned to 505 Park Avenue to get a lighter. (February 10, 2020 Transcript, p. 70).

While crossing the street to return, he saw two black males turning the corner at Cherry and Park Streets. (February 10, 2020 Transcript, p. 70). The one was tall and slender while the other was heavy set with dreadlocks. (February 10, 2020 Transcript, p. 71).

Upon his return to 505 Park Avenue, he saw the back door open and a hat on the back patio. (February 10, 2020 Transcript, pp. 70, 77). He went into the decedent's room and saw him laying on the floor in a puddle of blood with a bullet wound to the side of his head. (February 10, 2020 Transcript, p. 71).

On August 30, 2016, Trent Peacock was working as an agent for the Williamsport Bureau of Police investigating violent crimes. (February 10, 2020 Transcript, p. 95). He responded to the shooting scene at 505 Park Avenue. (February 10, 2020 Transcript, p. 96). Upon arrival, he noticed a gray ball cap and a black scarf or sleeve type item both laying on the back porch. (February 10, 2020 Transcript, p. 96).

He became the lead investigator in the case. (February 10, 2020 Transcript, p. 102). His investigation determined that five people had been at the scene at or around the shooting including Savoy Jennings, Tyrone Small, Lewis Martin, Janiece Green and Jeff Green. (February 10, 2020 Transcript, p. 103).

On September 27, 2016, he submitted the following items to

14

the lab for DNA testing: the decedent's DNA profile; the black cutoff sleeve found on the back porch; the gray ball cap found on the back porch; and white socks. (February 11, 2020 Transcript, p. 59). He also sent to the lab [Appellant's] DNA sample and the DNA sample of Mr. Rooks. (February 11, 2020 Transcript, pp. 60-61).

Trooper William Jones was employed by the Pennsylvania State Police at Troop F in Montoursville, PA on August 30, 2016. (February 10, 2020 Transcript, p. 109). He was called to the crime scene to assist as indicated above by taking photographs and a video. (February 10, 2020 Transcript, pp. 109, 110).

Trooper Russell Ramin was employed by the Pennsylvania State Police in August of 2016 and was called to assist with the crime scene. (February 10, 2020 Transcript, p. 117). He collected two items depicted in Commonwealth Exhibit 26 (the ball cap and the cloth/sleeve) and released them to Williamsport police officer Joseph Ananea. (February 10, 2020 Transcript, p. 119).

Joseph Ananea was employed by the Williamsport Bureau of Police and assigned to the Forensic Services Unit. (February 10, 2020 Transcript, p. 120). On August 30, 2016, he was called to the crime scene. (February 10, 2020 Transcript, p. 122). He took a photograph of the ball cap and the cloth/sleeve on the back porch which was introduced and marked as Exhibit 37. (February 10, 2020 Transcript, p. 123). In the room where the decedent's body was found, he collected a bloody sock "draped over the…washing machine…next to the body." (February 10, 2020 Transcript, p. 125).

He took the custody of the ball cap and "sleeve" from Trooper Ramin. (February 10, 2020 Transcript, p. 126). The ball cap was described as a Brooklyn Dodgers ball cap (Commonwealth Exhibit 39) and the sleeve was described as a black cut off sleeve. (Commonwealth Exhibit 40).

He was present for the autopsy of the decedent, Chris [Wilkins], and took custody of the projectile and jacket taken from the body as well as a DNA sample. (February 10, 2020 Transcript, pp. 127-128; Commonwealth Exhibit 42).

Ariel Harlan testified that on August 30, 2016 she was driving her vehicle on Cherry Street in Williamsport, PA with Appellant as the front seat passenger. [Appellant] was wearing a Superman t-shirt and black sweatpants. She was driving a black Dodge Dart and Calvin Rooks was in the back passenger seat and Jamal Brown in the back driver seat. (February 11, 2020 Transcript, pp. 6, 7, 8, 14, 17).

She was parked on Cherry Street when Brown got out and walked toward 505 Park Avenue. After a few minutes, he returned. (February 11, 2020 Transcript, pp. 10, 11). After Brown returned, [Appellant] and Calvin Rooks got out of the car and met with Brown.

15

[Appellant] and Rooks then started walking toward 505 Park Avenue. (February 11, 2020 Transcript, p. 11).

After a few minutes, she heard a loud noise, then saw them running around the corner. As they were running around the corner to her car, she saw [Appellant] shoving a gun and cloth type thing in his waistband. [Appellant] jumped in her car, screamed for her to drive away and she did so. (February 11, 2020 Transcript, pp. 11, 12, 13). As she drove away, [Appellant] threw a "cloth thing" out of the car. Later she returned to where he threw it and saw that it was a mask. (February 11, 2020 Transcript, pp. 12, 15).

Jamal Brown testified that on August 30, 2016, he encountered [Appellant] on Park Avenue and [Appellant] asked him about the $300.00 that Brown owed him for [Appellant] fronting him some crack cocaine. (February 11, 2020 Transcript, pp. 20, 21).

[Appellant] told him that he wanted to "rob" 505 Park Avenue because "guys from Philadelphia" sold drugs out of there. He asked Brown to describe the layout. After Brown described the layout, [Appellant] left. (February 11, 2020 Transcript, p. 21).

Later, [Appellant] encountered Brown again and told Brown it was "a go." Brown got in the car with [Appellant] and Ms. Harlan. (February 11, 2020 Transcript, p. 22).

All three then drove to the Timberland Apartments where they picked up Calvin Rooks who was described by Brown as black, heavy set with dreadlocks. (February 11, 2020 Transcript, pp. 22, 23).

They then drove back to Park Avenue. Ms. Harlan parked the car on Cherry Street. Once they arrived, [Appellant] pulled a small revolver gun out of a bag and gave it to Mr. Rooks. [Appellant] pulled a bigger revolver, believed to be black, out of the bag for himself. (February 11, 2020 Transcript, pp. 23, 24, 50).

After [Appellant] went across the street to speak with "Jerry", he came back to the car. Rooks got out, they both went around the corner up to the handicap ramp and yelled to Brown, who could see them from his vantage point, that the door was locked. Brown replied that it was not locked. (February 11, 2020 Transcript, pp. 24, 25, 27, 29, 49).

As indicated, Brown could see the back of 505 from where he was located and saw both [Appellant] and Rooks go inside the back door. (February 11, 2020 Transcript, pp. 26-27). As he was walking away from the scene, he heard a loud bang. (February 11, 2020 Transcript, p. 28).

Steven Schmit was employed by the Pennsylvania State Police and was called to the scene on August 30, 2016 to "document and forensically map the scene and evidence." (February 11, 2020 Transcript, pp. 52, 53).

Tyrone Small was inside 505 Park Avenue on August 30, 2016. (February 11, 2020 Transcript, pp. 89-90). He was in the living room

while the decedent and Savoy Jennings also known as "Vortex" were in the decedent's room. (February 11, 2020 Transcript, pp. 44, 91). Vortex then left. (February 11, 2020 Transcript, p. 91).

Mr. Small then saw two individuals "run" into the residence. (February 11, 2020 Transcript, p. 91). One of the "dudes" who came in hit Mr. Small on the back of his right shoulder with a gun knocking him down. (February 11, 2020, Transcript, pp. 91, 92). They got him up, opened the decedent's door, put Small back on the ground and one of the assailants pointed a gun at the decedent asking him where the stuff was.(February 11, 2020 Transcript, p. 92).

When the decedent indicated he didn't know, "one of them shot him." (February 11, 2020 Transcript, p. 92, 101). Immediately after the shooting, the smaller assailant went through the decedent's pockets. (February 11, 2020 Transcript, p. 101).

He could not identify the assailants, they both had masks on, other than noting that they were "black." (February 11, 2020 Transcript, pp. 92, 93).

When he was locked up at the PRC, he met Calvin Rooks and talked with him. (February 11, 2020 Transcript, pp. 102, 103). He definitely knew his voice. (February 11, 2020 Transcript, p. 103). However, he did not know whether it was similar to what he heard during the incident because he wasn't thinking about it. (February 11, 2020 Transcript, p. 103).

James Rooks, who goes by Calvin, was at 505 Park Avenue with [Appellant] on August 30, 2016. (February 11, 2020 Transcript, p. 105). Earlier in the day, [Appellant] came to Rooks' girlfriend's house and said he needed Mr. Rooks; so Mr. Rooks went with him. They both got into Ariel Harlan's car. (February 11, 2020 Transcript, pp. 106, 107, 108).

They drove toward Park Street but parked on a "side street." [Appellant] tried to give him a gun. [Appellant] gave him a face mask "like a pant leg." [Appellant] had a similar mask with his gray hat on. (February 11, 2020 Transcript, pp. 109, 110, 111).

They went through the back door at 505 Park Avenue and [Appellant] had a gun in his hand. (February 11, 2020 Transcript, pp. 111, 112). While Rooks was in the hallway looking in, [Appellant] went into the decedent's room, hit another dude with a gun knocking him down to the floor, asking the "boy to give it up", they started tussling, and [Appellant] shot him. (February 11, 2020 Transcript, pp. 113, 114, 124).

They then left, [Appellant] took the mask off and Rooks threw his mask on the porch. (February 11, 2020 Transcript, pp. 114, 118, 129, 130).

Rooks identified the picture of the Brooklyn Dodgers ball cap as the hat [Appellant] was wearing. (February 11, 2020 Transcript, pp. 117, 118). At the time of the incident, Rooks had small twisty hair like

17

dreads (February 11, 2020 Transcript, p. 118). The mask found on the back porch was the one that Rooks was wearing. (February 11, 2020 Transcript, p. 121).

The Commonwealth presented the testimony of six expert witnesses to address chain of custody and DNA evidence. Brunee Coolbaugh testified as an expert in the field of serological analysis and was employed by a forensic scientist for the Pennsylvania State Police. (February 11, 2020 Transcript, p. 64).

Kelsey Gober, was employed by the Pennsylvania State Police as a Forensic Scientist (February 11, 2020 Transcript, pp. 69, 70) and testified as an expert in the field of serology. (February 11, 2020 Transcript, pp. 70, 71). She tested various items to determine if there was any biological material on them noting that there were no visible stains on the ball cap. (February 11, 2020 Transcript, p. 86).

Barbara Bollinger, M.D. is employed by Forensic Pathology Associates and was admitted as an expert in the field of forensic pathology. (February 11, 2020 Transcript, pp. 12, 13). She performed the autopsy on the decedent and testified that he sustained a gunshot wound to his head causing him to die. (February 12, 2020 Transcript, pp. 15, 16, 17, 18, 20). She also testified that stippling was observed at the wound entrance site indicating that the gunshot was somewhere between one and three feet away. (February 12, 2020 Transcript, pp. 19, 20, 21, 22).

Regina Kozero was employed as a Forensic Scientist and was admitted as an expert in the field of DNA analysis. (February 12, 2020 Transcript, pp. 24, 25). She prepared a DNA profile of [Appellant]. (February 12, 2020 Transcript, p. 29).

Britney Lenig was employed as a Forensic Scientist for the Pennsylvania State Police and was admitted as an expert in the field of DNA analysis. (February 12, 2020 Transcript, pp. 34, 35). She received and processed five items for analysis including the blood sample card from the decedent, a cutting from inside the Brooklyn Dodgers ball cap, two cuttings from the sock found on the washer in the decedent's bedroom, a DNA profile for [Appellant] and a cutting from the black cutoff sleeve found on the back porch. (February 12, 2020 Transcript, pp. 40, 41). She also received three known reference samples from the decedent, Rooks and [Appellant]. (February 12, 2020 Transcript, pp. 50, 51).

She testified that the major DNA contributor to both the sleeve and the hat was a match to [Appellant]. (February 12, 2020 Transcript, pp. 57, 59).

The Commonwealth's final witness was Jennifer Horoyak-Bracamontes. She is a DNA Analyst for a company called Cybergenetics. (February 12, 2020 Transcript, p. 63). She testified as an expert in the field of DNA evidence interpretation. (February 12, 2020 Transcript, p. 67).

Using a "super computer" program called True Allele which was first developed in the early 2000's but updated in 2009, she analyzed data from the black cutoff sleeve, the Brooklyn Dodgers baseball hat and the two cuttings from the sock, and compared those with known samples from the decedent and [Appellant]. (February 12, 2020 Transcript, pp. 79, 80, 81, 82).

Based upon the computer's analysis and results, there was a very high statistical DNA match between both the sleeve and the hat and [Appellant]. (February 12, 2020 Transcript, pp. 83, 90).

With respect to the sleeve, there were five DNA contributors and with respect to the hat, there were three. [Appellant], however, contributed most of the DNA to both samples. (February 12, 2020 Transcript, pp. 86, 88, 91, 92).

The remaining testimony and evidence presented to the jury was presented as part of [Appellant's] case in chief.

Eric Armstead was employed as a property manager for the Lycoming County Housing Authority. (February 12, 2020 Transcript, p. 77). Jonathan Green testified that the [Appellant] was previously at 505 Park Avenue and knew the layout. (February 12, 2020 Transcript, p. 109). He also testified that he previously saw Jamal Brown wearing a Brooklyn Dodgers gray hat. (February 12, 2020 Transcript, pp. 109, 110).

In addition to the testimony by Lewis Martin indicated above, he testified that he works as a personal care assistant and was at 505 Park Avenue when the shooting occurred. (February 12, 2020 Transcript, pp. 128-129). The previous night he was hanging out, playing cards and "doing drugs" including marijuana and heroin. (February 12, 2020 Transcript, pp. 129, 138).

He was asleep in a chair in Jeffrey Green's room and heard "I ain't got nothing" repeated three times and then he heard a "pop." (February 12, 2020 Transcript, pp. 130, 131). He saw two individuals come out of the decedent's room. One was short, slim and muscular and the other was a little taller with really dark skin. (February 12, 2020 Transcript, pp. 131, 132, 133, 140, 141).

Based on all of this evidence, when the jury rendered its verdict, this judge did not temporarily lose his breath. The verdict did not cause this judge to almost fall from the bench. The verdict was not truly shocking to the judicial conscience of the court or in other words, did not shock this judge's sense of justice.

Opinion and Order, 5/6/20.

Appellant next avers that the trial court abused its discretion by permitting the

19

jury to have in its possession during its deliberations inflammatory and overly prejudicial photos.[6] The trial court cannot agree.

Subject to certain exceptions not applicable here, Rule 646 of the Pennsylvania Rules of Criminal Procedure permits the jury, upon retiring to deliberate, to "take with it such exhibits as the trial judge deems proper." Pa. R. Crim. P. 646(A). The Pennsylvania Supreme Court has "interpreted this Rule as committing the determination of what objects may be viewed by the jury during its deliberations to the sound discretion of the trial court" which will not be reversed absent an abuse of discretion. *Commonwealth v. Haney*, 131 A.3d 24, 38 (Pa. 2015). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence of record, discretion is abused." *Id.* at 39.

There is nothing in the record to show that the trial court misapplied or overrode the law, exercised manifestly unreasonable judgment, or made its decision based on partiality, prejudice, bias or ill will. Rather, prior to its admission into evidence, the trial court viewed the photographs and considered the arguments of the parties. See Trial Transcript, Feb. 12, 2020, at 2-10. The trial court found that the photographs were not inflammatory or unduly prejudicial. Instead, the trial court agreed with the Commonwealth's argument that the photographs were relevant and admissible, particularly with respect to the intent to kill.

---

[6] While the court and counsel were discussing the items of evidence the court would permit the jury to possess during its deliberations outside of the presence of the jury, Appellant's counsel objected to the jury possessing Commonwealth's Exhibits 51, 52 and 53. Trial Transcript, Feb. 13, 2020, at 105.

The Commonwealth utilized these exhibits during the testimony of the forensic pathologist, Dr. Barbara Bollinger. Trial Transcript, Feb. 12, 2020, at 18-19. Commonwealth's Exhibit 51 depicted the gunshot wound in the Victim's left earlobe as well as a portion of his head and neck around the left ear so that the jury could see the stippling around the gunshot wound. Commonwealth's Exhibit 52 depicted a close-up of the Victim's left ear so that the jury could better observe the stippling. Commonwealth's Exhibit 53 depicted a gloved hand lifting the left earlobe to show where the bullet entered the Victim's scalp.

Dr. Bollinger testified that stippling is useful in estimating the range of fire, that is, the distance from the end of the gun to the victim's wound. Dr. Bollinger estimated the range of fire was from about 12 inches to 3 feet. Id. at 19.

Although the pathologist had cleaned the body, there was a small amount of blood around the gunshot wound and inside the Victim's ear. The fact that some blood was still visible does not require a finding that the photographs were inflammatory. *Commonwealth v. Lewis*, 567 A.2d 1376, 1382 (Pa. 1989).

In *Commonwealth v. Karenbauer*, 715 A.2d 1086 (Pa. 1988), the Court stated:

Photographs of a murder victim are not per se inadmissible. Rather, it is the manner in which the body of the victim is displayed that causes photographs to be emotionally charged. Concerning admissibility, the determinative inquiry is whether the photos have evidentiary value that outweighs the possibility of inflaming the minds and passions of the jurors. The trial court's decision in the matter will not be reversed absent an abuse of discretion.
It is well established, and of particular importance to our analysis, that photographs of the victim's wounds may be relevant to show the assailant's intent to kill. In assessing the intent of the actor in a case of criminal homicide, ... the fact finder who deals in such an intangible inquiry must be aided to every extent possible. Accordingly, the fact that a medical

21

examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant.

*Id.* at 1096 (citations and quotation marks omitted).

The manner in which the body was displayed in the photographs was focused solely on the location of the gunshot wound, and none of the photographs showed the victim's face. Moreover, the specific intent to kill was a contested issue at trial. Accordingly, the trial court did not abuse its discretion in permitting the jury to possess these photographs during its deliberations.

Appellant asserts that the trial court erred in failing to charge the jury with a failure to call potential witness instruction even though the Commonwealth failed to call three of the eyewitnesses[7] at the scene of the crimes. Those witnesses allegedly were Jeff Green, Jerry Green, and Lou Martin.[8] Trial Transcript, Feb. 13, 2020, at 12-15.

The failure to call potential witness instruction states:

1. There is a question about what weight, if any, you should give to the failure of [a party] [the Commonwealth] [the defendant] to call [a person] [name of person] as a witness.
2. If [however] three factors are present, and there is no satisfactory explanation for a party's failure to call a potential witness, the jury is allowed to draw a common-sense inference that [his] [her] testimony would have been unfavorable to that party. The three necessary factors are:
First, that the person is available to that party only and not to the other;
Second, that it appears the person has special information material to the issue; and
Third, that the person's testimony would not be merely cumulative.
3. Therefore, if you find these three factors present, and there is no satisfactory explanation for the [party's] [Commonwealth's] [defendant's]

---

[7] The trial court believes that counsel's description of Jeff Green and Jerry Green as eyewitnesses is a bit of a mischaracterization of the potential information these witnesses could provide. There is nothing in the record to suggest that either individual observed the shooting or any of the conduct that occurred inside the apartment.
[8] It appears that the proper names of the witnesses were Jeffrey Green, Jerome Green, and Lewis Martin.

22

failure to call [a person] [name of person] to testify, you may infer, if you choose to do so, that [his] [her] testimony would have been unfavorable to [that party] [the Commonwealth] [the defendant].

Pa.SSJI (Crim), §3.21A.

This instruction clearly did not apply to Lewis Martin, as Appellant's counsel called Mr. Martin as a defense witness at trial. See Trial Transcript, Feb. 12, 2020, at 127-154.

The other two witnesses were not available only to the Commonwealth. Rather, it appears that these witnesses were equally available or unavailable to both the Commonwealth and Appellant. As far as the Commonwealth knew, both Jeff Green and Jerry Green still resided at 505 Park Avenue. The Commonwealth provided their last known address to Appellant in discovery. Trial Transcript, Feb. 13, 2020, at 13-14. Furthermore, relatives of these allegedly missing witnesses testified for each of the parties. Janiece Green, the daughter of Jerry Green and the niece of Jeff Green, testified for the Commonwealth. See Trial Transcript, Feb. 10, 2020, at 53. Jonathan Green, the brother of Jeff Green and Jerry Green, testified for Appellant. See Trial Transcript, Feb. 12, 2020, at 107. Jonathan Green indicated that these individuals used to live at 505 Park Avenue.[9] Neither the Commonwealth nor Appellant asked Jonathan Green or Janiece Green during their trial testimony where these individuals were currently living.

Additionally, based on the testimony presented at trial, it does not appear that Jeff Green would have had any special information material to the issues in this case. The

---

[9] 505 Park Avenue is a duplex with an upstairs and a downstairs apartment. Jeffrey Green lived downstairs and Jerry Green lived upstairs. See Trial Transcript, Feb. 10, 2020, at 53; Trial Transcript, Feb. 12, 2020, at 107.

23

testimony presented at trial was that Jeff Green is a paraplegic who was asleep in bed in his bedroom at the time of the shooting. See Trial Transcript, Feb. 10, 2020, at 56, 61 (Janiece Green's testimony); Trial Transcript, Feb. 12, 2020, at 135 (Lewis Martin's testimony). He did not get out of his bed and into his wheelchair until his niece came over to the house after the shooting. Trial Transcript, Feb. 10, 2020, at 61. One cannot see inside the Victim's bedroom from inside Jeff Green's bedroom. See Trial Transcript, Feb. 12, 2020, at 139, 140 (Lewis Martin's testimony). Therefore, Appellant was not entitled to a missing witness instruction with respect to Jeff Green.

Case law provides additional exceptions to the missing witness instruction. To invoke the missing witness instruction against the Commonwealth, the witness must only be available to the Commonwealth and no other exceptions must apply. *Commonwealth v. Culmer*, 604 A.3d 1090, 1098 (Pa. Super. 1992). There are at least six circumstances or exceptions where a party is not entitled to the missing witness adverse instruction:

> 1. The witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth;
> 2. The testimony of such a witness is comparatively unimportant, cumulative, or inferior to that already presented;
> 3. The uncalled witness is equally available to both parties;
> 4. There is a satisfactory explanation as to why the party failed to call such a witness;
> 5. The witness is not available or not within the control of the party against whom the negative inference is desired; and
> 6. The testimony of the uncalled witness is not within the scope of the natural interest of the party failing to produce him.

*Commonwealth v. Miller*, 172 A.3d 632, 645-46 (Pa. Super. 2017), citing *Commonwealth v. Boyle*, 733 A.2d 633, 638 (Pa. Super. 1999).

In addition to being equally available or unavailable to the parties, the

24

testimony of Jerry Green would likely fall within exceptions 1, 2, or 6. Jamal Brown testified at trial that Appellant walked across the street and asked Jerry Green if he could rob 505 Park Avenue and Jerry told him yeah as long as he did not do anything to his brother, Jeff Green. Trial Transcript, Feb. 11, 2020, at 24-25. If Jerry Green were to testify favorably to the Commonwealth, his testimony would be cumulative to the testimony of Jamal Brown and fall within exception 2. However, if Jerry Green would not admit this type of connection or involvement in the crime, his testimony would fall within exceptions 1 or 6. Therefore, Appellant was not entitled to a missing witness instruction with respect to Jerry Green.

Finally, Appellant alleges that the trial court erred by precluding the exculpatory testimony of Leon Hall who would have testified that one of the witnesses who testified against Appellant admitted to committing the crimes.

During trial, Appellant's counsel made an offer of proof that Leon Hall would testify to the following: He had been friends with Jamal Brown. On the day of the shooting, he was scared because he had heard that two shooters were coming after Jamal Brown. Jamal Brown did not want to discuss it over the phone so Leon Hall met Jamal Brown at the Shamrock, a local bar. As they were sitting at the Shamrock, Leon Hall said something to the effect of if people are trying to kill you maybe sitting in front of the Shamrock is not a good idea. Jamal Brown then said something to the effect of, "no, it's cool," or "it's a throw off; it was me." Leon Hall took that to mean that Jamal Brown admitted to being the shooter at 505 Park Avenue. Trial Transcript, Feb. 12, 2020, at 112-121.

The Commonwealth argued that Leon Hall's interpretation of the statement was a "leap" and Jamal Brown's statements were inadmissible hearsay. Appellant's counsel

25

argued that the statements were a "non-party admission" or a statement against interest. The Commonwealth indicated that the statement did not satisfy the hearsay exception for statements against interest.

Although there is a hearsay exception for an admission or statement of an opposing party, see Pa. R. E. 803(25), there is no exception for a "non-party admission." There is a hearsay exception for a statement against interest but the statement in question did not meet the requirements of that exception.

Rule 804(b)(3), which governs the admissibility of statements against interest, states:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
> (3) *Statement Against Interest.* A statement that:
> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa. R. E. 804(b)(3).

There is nothing in the record to suggest that Jamal Brown was unavailable as a witness. To the contrary, Jamal Brown testified at trial as a witness for the Commonwealth. Trial Transcript, Feb. 11, 2020, at 18-51.

The trial court also disagreed with Appellant's characterization of the statement as an admission by Jamal Brown that he was the shooter. The statement is very vague. Brown either said "it's cool," "it's a throw off" and/or "it was me." One cannot tell

26

to what "it" refers. Rather than indicating that Brown was the shooter, Brown may simply have been trying to assure Leon Hall that he knew the individuals were not looking for him, because Brown assisted the individuals by providing information about the residence and its occupants in exchange for the discharge of his drug debt.

The statement also was not supported by corroborating circumstances that clearly indicate its trustworthiness.

> Among the factors a court might consider in determining the reliability of inculpatory or exculpatory statements are:
> the circumstances under which the statements were uttered, including the custodial/non-custodial aspect of the setting and the identity of the listener; the contents of the statement, including whether the statements minimize the responsibility of the declarant or spread or shift the blame; other possible motivations of the declarant, including improper motive such as to lie, curry favor, or distort the truth; the nature and degree of the "against interest" aspect of the statements, including the extent to which the declarant apprehends that the making of the statement is likely to actually subject him to criminal liability; the circumstances or events that prompted the statements, including whether they were made with the encouragement or at the request of a listener; the timing of the statement in relation to events described; the declarant's relationship to the defendant; and any other factors bearing upon the reliability of the statement at issue.

*Commonwealth v. Cascardo*, 981 A.2d 245, 258 (Pa. Super. 2009), quoting *Commonwealth v. Robins*, 812 A.2d 514, 525-26 (Pa. 2002). "While there is no required list of factors for conducting this evaluation, we note the commonly referenced ones listed supra, and thus begin with a consideration of the basic components, of when and where the statements were made, to whom they were made and what was said." *Cascardo*, 981 A.2d at 258-59, quoting *Robins*, 812 A.2d at 526.

The statement was a vague, apparently off-the cuff remark to a friend while at a bar. It did not specifically admit any crime. It was not made in a custodial setting.

27

Furthermore, it was not made to law enforcement or "any other reliable persons of authority or those having an adverse inference to the declarant." See *Commonwealth v. Statum*, 769 A.3d 476, 479 (Pa. Super. 2001)(statement made to an attorney).

Since Jamal Brown was available as a witness, his purported statement to Leon Hall was not definitive enough to subject him to criminal liability, and the statement was not supported by corroborating circumstances that clearly indicated its trustworthiness, the trial court did not err in finding that Leon Hall's proposed testimony about the statement was hearsay.

DATE: 9-2-06

By The Court,

Marc F. Lovecchio, Judge

cc:     Martin Wade, Esquire (ADA)
        Jeana Longo, Esquire
        Work file
        Gary Weber, Esquire (Lycoming Reporter)
        Superior Court (original & 1)

28